UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


URS CORPORATION and
URS CORPORATION, GREAT LAKES,

    Plaintiffs,

                                         Civil No. 06-13253
                                         Hon. John Feikens

v.

TRAVELERS INDEMNITY COMPANY,

    Defendant.
_____/

**OPINION AND ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs URS Corporation and URS Corporation, Great Lakes bring a declaratory judgment action against Defendant Travelers Indemnity Company regarding the insurance policy issued by Defendant's predecessor[1] to Plaintiffs. Plaintiffs assert the policy provides up to $2 million of coverage, while Defendant claims the policy's $1 million per claim limit is its maximum exposure, and further claims that no coverage is available due to Plaintiffs' other applicable insurance policy. Plaintiffs and Defendant have filed cross-motions for summary judgment. I hereby GRANT IN PART and DENY IN PART Plaintiffs' motion and GRANT IN PART and DENY IN PART Defendant's motion, finding that Defendant is required to provide coverage for up to $1 million.

---

[1]Travelers is the successor in interest to Gulf Insurance Company, who issued this policy to Plaintiffs. (Compl. ¶ 4; Am. Answer ¶ 4.) Throughout this opinion I will refer to the insurance policy issued by Gulf as "the Travelers policy" for ease in reference, despite the fact that Travelers did not itself issue the policy; its predecessor Gulf did.

I.      FACTUAL BACKGROUND

Plaintiffs and their joint venture partner[2] entered into contracts with the Detroit Public School System ("DPS") in December of 2000 to design two schools. (Def't Mot. for Summ. J. Ex. E.) DPS filed suit against Plaintiffs claiming the design of these schools was defective. (Def't Mot. for Summ. J. Ex. F.) This suit contained three counts: (1) Breach of Contract, (2) Professional Malpractice, and (3) Declaratory Relief regarding the arbitrability of the DPS litigation. (Id.) Plaintiffs had an insurance policy ("the Travelers policy") from Defendant's predecessor for those design projects. (Pls. Mot. for Summ. J. Ex. D.) When the DPS litigation was filed, Plaintiffs submitted a claim to Defendant pursuant to the Travelers policy. (Def't Mot. for Summ. J. Ex. H.) Defendant hired counsel to represent Plaintiffs in the DPS litigation, but invited Plaintiffs to retain counsel at its own expense to "protect [its] interests" against "any excess exposure." (Id. at 2.) Defendant also indicated in general terms that it was reserving all of the rights and defenses it might have under the Travelers policy. (See, e.g., Pls. Mot. for Summ. J. Ex. N (collection of reservation of rights letters sent by Defendant to Plaintiffs).) The parties disputed, and still dispute, the proper maximum exposure of Defendant in this suit: Plaintiffs claim it should be $2 million because multiple claims are being made on the policy, while Defendant claims it should be the $1 million per claim maximum because the claims "aris[e] from the same act, error, or omission or a series of related acts, errors or omissions" of Plaintiffs. (See Def't Mot. for Summ. J. Ex. G at § III.B.) Defendant has repeatedly indicated its belief that $1 million is its maximum exposure. (See, e.g., Pls. Mot. for Summ. J. Ex. N.)

---

[2]Plaintiffs' joint venture partner, The Design Collective, is not a party to this litigation. The Travelers policy was purchased by the joint venture, but as Plaintiffs are litigating this case themselves I refer to the insured as Plaintiffs throughout this factual background.

On July 18, 2006, Plaintiffs filed this action seeking a declaratory judgment regarding Defendant's maximum exposure under the Travelers policy. In late July, before Defendant filed its Answer, Plaintiffs realized they were a potential beneficiary of another insurance policy issued by Lexington Insurance Company ("the Lexington policy") that applied to the DPS litigation. (Pls. Mot. for Summ. J. Ex. C ¶ 7.) This policy, which had a maximum benefit of $5 million, was obtained by the DPS Program Manager Team LLC and purportedly insures many companies involved in the construction of schools.[3] (Def't Mot. for Summ. J. Ex. R.) Plaintiffs supplied Defendant with a copy of the Lexington policy on August 2nd, and stipulated to permitting Defendant two additional weeks to file its Answer. (Pls. Mot. for Summ. J. Ex. K.) Defendant used these extra two weeks and filed its Answer and Affirmative Defenses August 21st, nineteen days after receiving a copy of the Lexington policy.[4] Defendant has admitted that at that time it believed the Lexington policy provided primary coverage for the DPS litigation and the Travelers policy provided excess coverage. (Pls. Mot. for Summ. J. Ex. F ¶ 41.)

Little occurred in this case between the filing of the Answer and January as both parties were working on the DPS litigation. (See Pls. Mot. for Summ. J. 3-5; Def't Mot. for Summ. J. 4-6.) At a mediation session for the DPS litigation on November 15th, Defendant's counsel

---

[3]The Named Insureds on the Lexington policy are "Barton Malow Company; CTE Engineers; Jomar Building Company; DMJM, Inc. d/b/a Spillis Candela/DMJM; W-3 Construction Company; AGM, LLC; All design consultants, construction management consultants, program management consultants and all of their respective subconsultants and all other such professionals (excluding environmental consultants or subconsultants) as are currently or may become involved in rendering professional services and covered operations on the covered project." (Def't Mot. for Summ. J. Ex. R.)

[4]One of the affirmative defenses submitted at that time was that "[t]here is other insurance available to cover the [DPS litigation] which is primary." (Answer at 8.) That defense then specifically identifies the Lexington policy. Id.

3

represented that Defendant would contribute up to $1 million to settling the DPS litigation. (Pls. Mot. for Summ. J. Ex. F ¶ 32.) As late as December 19th, Defendant informed Plaintiffs of the current amount spent defending Plaintiffs in the DPS litigation and how much money was remaining in the policy to cover Plaintiffs' liability to DPS.[5] (Pls. Mot. for Summ. J. Ex. L.) After multiple settlement offers were made by each side in the DPS litigation, the last several of which Plaintiffs did not seek or receive approval from Defendant before making an offer, conditional settlement terms were reached on January 11, 2007. (See, e.g., Pls. Mot. for Summ. J. Ex. Q; Def't Mot. for Summ. J. Ex. Q.) Plaintiffs sought confirmation of the amount remaining on the Travelers policy before making its final offer prior to the conditional settlement, but reached the settlement before it received any response from Defendant. (See Def't Resp. Br. Ex. E.) After this conditional settlement was reached, for the first time Defendant specifically asserted Exclusion 15 of the Travelers policy, which it alleged barred any recovery for Plaintiffs because the Lexington policy, which Defendant believes is a project-specific policy, applied to the claim. (See Pls. Mot. for Summ. J. Ex. F ¶ 38.) Plaintiffs allege they justifiably relied upon Defendant's representations regarding coverage under the Travelers policy in the offers which resulted in conditional and then final settlement in the DPS litigation, and that they will be prejudiced by this late refusal to provide benefits. (Pls. Mot. for Summ. J. Ex. C ¶ 11.) Defendant claims the agreement on January 11th was merely a conditional settlement that required approval of the DPS board and finalization of some of the details, and that Plaintiffs knew within hours of reaching this conditional settlement that Defendant refused

---

[5]This letter again contained a statement that Defendant reserved all rights it had under the policy or otherwise. (Pls. Mot. for Summ. J. Ex. L at 2.)

to contribute. (Def't Resp. Br. 11-12.) Further, Defendant claims it did not know that Plaintiffs were insured by the Lexington policy until November 30, as a representative from Lexington refused to contribute any money to a settlement of the DPS litigation at a mediation as late as November. (Def't Mot. for Summ. J. 5 & Ex. J; <u>but see</u> Pls. Resp. Br. Ex. 3 (indicating Defendant knew of reasonable possibility that Lexington policy could apply to DPS litigation no later than September 12th).) On April 12th, the DPS board accepted this settlement which bound Plaintiffs to the terms of the conditional settlement reached on January 11th. (Pls. Mot. for Summ. J. Ex. E ¶¶ 8-9.)

## II. PROCEDURAL HISTORY

On January 23rd, Defendant filed a motion for leave to amend its Answer to add Exclusion 15 as an affirmative defense. I granted this motion on April 4th because I could not find undue prejudice to Plaintiffs if the amendment was granted because the settlement to that point was only conditional, but I did state I would entertain arguments that Defendant waived its right to assert this exclusion in a summary judgment motion if the settlement became final. (Docket No. 18, Op. & Order of April 4, 2007.) Each party filed a motion for summary judgment on May 4th that addresses three issues: (1) the applicability and effect of Exclusion 15, (2) the applicability and effect of the "Other Insurance" clause in the Travelers policy, and (3) whether Defendant's maximum exposure under the Travelers policy is $1 million or $2 million. Briefing is complete for each motion, and oral argument has been held.

## III. ANALYSIS

<u>1.</u>     <u>Standard of Review</u>

Summary judgment is proper if there is no genuine issue of material fact and the movant

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish or refute one of the essential elements of a claim or defense and would affect the application of governing law to the rights and obligations of the parties. Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence and any reasonable inferences drawn therefrom in a light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For a claim to survive summary judgment, the nonmovant must offer more than a mere scintilla of evidence as to the material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The movant's burden is satisfied where there is an absence of evidence to support the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

2.  Coverage is Available Under the Travelers Policy

    *A.  Applicability of Exclusion 15*

I find Defendant is estopped from asserting Exclusion 15 of the Travelers Policy. This exclusion reads:

> This insurance does not apply to and WE will not defend any CLAIM or pay any amounts under this policy for any CLAIM or any CLAIM EXPENSES arising out of: ... Any CLAIM arising from any project for which YOU are an INSURED under any other professional liability policy issued for any specific client(s) or specific project(s).

(Def't Mot. for Summ. J. Ex. G.)[6] I addressed this exclusion when I granted a motion by Defendant to add it as an affirmative defense six months after the Complaint was filed. (Op. & Order of April 4, 2007.) In that opinion I found that Plaintiffs had failed to show undue prejudice because at that time they had only agreed to a conditional settlement. (Id. at 6 n.5.)

---

[6]All capitalized terms in each quoted section of the Travelers policy are terms that are defined within the policy.

DPS has now adopted this settlement and Plaintiffs are bound to the terms from January. (See Pls. Mot. for Summ. J. Ex. E ¶¶ 8 & 9.)

Estoppel is properly invoked here. Although it is preferred that the doctrines of waiver and estoppel not be used to expand coverage beyond what was provided by the contract, it is proper to do so in cases where the "inequity of forcing the insurer to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurance company's actions." See Smit v. State Farm Mutual Auto. Ins. Co., 525 N.W.2d 528, 531 (Mich. Ct. App. 1994) citing Lee v. Evergreen Regency Coop., 390 N.W.2d 183, 186 (Mich. Ct. App. 1986). Other courts have used this exception to find insurers were estopped from asserting an exclusion when the exclusion was first asserted after the verdict in a trial in which the insurance company provided an attorney who defended the insured, Meirthew v. Last, 135 N.W.2d 353, 356 (Mich. 1965) (finding notice from insurer to insured of an exception to coverage after imposition of jury verdict "too late to avoid presumptive prejudice"), and when an attorney first raised the exclusion after the pre-trial conference. Cozzens v. Bazzani Bldg. Co., 456 F. Supp. 192, 201 (E.D. Mich. 1978) (Pratt, J.). Judge Pratt stated this proposition most clearly:

> Meirthew stands for the proposition that when there arises the substantial possibility that the carrier's duty to defend will come into conflict with its duty to pay under the policy, and when the carrier fails to notify its insured of the nature and existence of the possible conflict clearly and promptly, the duty to defend assumes the ascendancy and the carrier is estopped to deny its liability.

Cozzens, 456 F. Supp. at 198. Although this Court has found no cases that explicitly apply this concept to a case that ends in settlement, reliance on the protection of insurance until the verge of reaching a settlement when the insurer is well aware of the progression of settlement

7

discussions should provide the same protection for an insured against an insurer's late-arising assertions as reliance until the issuance of a jury verdict or the close of pre-trial activities.[7] As a settlement is equally as final to litigation as a jury verdict, this analogy is proper. For this reason, I find that Defendant is estopped from asserting Exclusion 15 to disclaim coverage.[8]

> B. *Applicability of "Other Insurance" Exclusion*

I find that the "Other Insurance" clause of the Travelers policy does not bar Plaintiffs from recovery. This clause in the Travelers policy reads:

> If YOU have other insurance that applies to any CLAIM covered by this policy, the other insurance must pay first. This policy only applies to the amount of the CLAIM that exceeds the available limit of insurance, whether collectible or not, of the other insurance.

(Def't Mot. for Summ. J. Ex. G. § V.G.) The law on excess insurance clauses is clear, but difficult to apply in this situation. An excess insurance clause "'kicks in' only after underlying insurance is exhausted." Rhone-Poulenc, Inc. v. Int'l Ins. Co., 877 F. Supp. 1170, 1177 (N.D. Ill. 1995). The Michigan Supreme Court has made clear there are at least two types of excess

---

[7]Defendant argues that it should not be estopped because it raised this argument with Plaintiffs shortly after learning that payment was to be made on the Lexington policy. (Def't Resp. Br. 8-9.) Further, it cites communication from Plaintiffs' counsel in which counsel requested "clarif[ication of] the exact amount left] on the Travelers policy and "confirm[ation] that the remaining unimpaired amount will be available" for settling the DPS litigation. (Def't Resp. Br. Ex. H.) This argument misses the point, however. Defendant was required to call this specific disclaimer of coverage to Plaintiffs' attention when "the substantial possibility" of the clause's applicability arose. Cozzens, 456 F. Supp. at 198. The substantial possibility that another professional liability insurance policy, issued for a specific project, was applicable to this claim was called to Defendant's attention no later than September 12th, and its failure to assert the exclusion for months after that date until the eve of settlement is grounds for estoppel.

[8]Plaintiffs further argue that their claims on the Travelers policy are outside the scope of Exclusion 15 and it therefore does not apply, but I do not reach that issue because I find Defendant is estopped from raising the exclusion at all.

insurance coverage: (1) true excess coverage which "occurs where a single insured has two policies covering the same loss, but one policy is written with the expectation that 'the primary will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted'" and (2) coincidental excess coverage which would be primary but for the presence of another policy which is primary over itself. Bosco v. Bauermeister, 571 N.W.2d 509, 516 (Mich. 1997); see also 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 219.18 n.78 (3d ed. 2005) ("True excess insurance must be distinguished from insurance which is written to be primary, but includes an 'other insurance' clause making it excess in those circumstances in which another policy, also written to be primary, applies to the loss."). When an insured has a primary policy and an excess policy, the excess policy is only required to pay benefits if the primary policy is exhausted. Smit, 525 N.W.2d at 533 ("the excess insurer is not required to pay more than the limits of its policy to satisfy the amount of the judgment remaining to be paid after credit is given for the total amount of the primary insurance coverage"); see also UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co., 647 A.2d 182, 190 (N.J. Super. Ct. Law Div. 1994) ("[T]he excess carrier is entitled to a credit for the full amount of the primary carrier's coverage before it is required to pay...."); 15 Couch on Insurance § 219.33 ("Where one policy has an excess other insurance clause and another policy on the same risk does not, the former policy will not come into effect until such time as the limits of the latter policy are exhausted."). Other courts have found no problem with an insured seeking benefits from an excess insurer after settling with its primary insurer, but it can only do so if it can prove damages above the limits of the primary insurance policy. See, e.g., Allstate Ins. Co. v. Riverside Ins. Co. of Am., 509 F. Supp. 43, 47-48 (E.D. Mich. 1981) (Newblatt, J.); Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440,

1454 (3d Cir. 1996) (predicting the Pennsylvania Supreme Court would find that "settlement functionally exhausts primary coverage and therefore triggers the excess policy - though by settling the policyholder loses any right to coverage of the difference between the settlement amount and the primary policy's limits.").

First, it is clear that this policy is coincidental excess insurance. The Travelers policy was not issued with the intention of being excess to the Lexington policy; we know this because neither party knew of the Lexington policy until well after the Travelers policy had been in effect. (Pls. Mot. for Summ. J. Ex. K; Pls. Resp. Br. Ex. 3.) cf. Allstate, 509 F. Supp. at 45 n.2 (defining true excess policy as one "where the excess insurer explicitly undertakes to provide insurance with the knowledge that primary insurance coverage has already been purchased").

Second, it is clear that Defendant did not waive its right to exercise this clause. In each of its Answers to the Complaint it asserted an affirmative defense that "[t]here is other insurance available to cover the Underlying Action which is primary," and then identified the Lexington policy. (Answer at 8; Am. Answer at 8.) Plaintiffs allege that because Defendant did not identify this clause in its response to Plaintiffs' interrogatories it has waived the right to assert this clause pursuant to Fed. R. Civ. P. 26(e)(1) and 37(c)(1). (Pls. Resp. Br. 6.) Defendant responds that because it disclosed this affirmative defense in its Answer, which was in writing, a finding of waiver would be inappropriate. (Def't Reply Br. 3.) Defendant has the better of this argument. Because Defendant disclosed this defense in writing, it has met the requirements of the rule. See Fed. R. Civ. P. 26(e)(1) (requiring supplementation of discovery responses "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"). Defendant is guilty of a sloppy answer to an

interrogatory, but it should not be forbidden from raising this affirmative defense because of it.

The difficulty that arises is that the nature of the Lexington policy, which all parties stipulate is primary, complicates the determination of whether it has been exhausted. This policy was taken by the DPS Program Manager Team LLC, and purported to insure many companies involved in the construction of schools. See supra n.3. This policy states it is primary for "breach[es] of professional duty in the performance of professional services." (Def't Mot. for Summ. J. Ex. R at §§ I.A.1 & V.C.) Further, it limits liability under this policy to $5 million in the aggregate. (Id. at § IV.B.) In this case, there were two claims made on the Lexington policy: one by Plaintiffs for $3.82 million and another claim made by Devon Industrial Group for $3.1 million. (See Def't Mot. for Summ. J. Ex. S.) As these totaled more than the $5 million aggregate limit of liability, in light of a threatened interpleader action by Lexington the parties reached a settlement that Devon would get $3 million minus payments previously made and URS would get $2 million.[9] Id. Defendant argues it should only be liable to pay damages above $5 million because that was the aggregate limit of the Lexington policy, while Plaintiffs claim that policy has been exhausted and Defendant must pay for damages above the $2 million it received from the Lexington policy settlement. Thus, the following question arises: in a policy where multiple insureds can claim benefits to a certain aggregate cap, where does a coincidental excess insurer's liability for one of those insureds begin? If it is only when its insured receives the entirety of the aggregate limit, Defendant is not liable to Plaintiffs; if it is when the aggregate

---

[9]The Devon payment was to be made so that Devon could seek to settle litigation against it. If it was able to settle its case for less than the amount it received, it was to pay up to $1.82 million to Plaintiffs in this case so they could use that money for settlement in the DPS litigation. (Def't Mot. for Summ. J. Ex. S ¶ 6.)

is met regardless of what the coincidental excess insurer's insured received, Defendant is liable.

I find that the other insurance clause in the Travelers policy does not prevent Plaintiffs from recovering from Defendant. The theory behind permitting recovery from an excess insurer only when the damages exceed the maximum liability of the primary insurer is based upon the bargain between the excess insurer and the insured, a bargain which provides insurance coverage only for damages above a certain amount.[10] In the standard situation, where the primary insurer and excess insurer both insure only one insured, there is a defined value at which the excess insurance kicks in. For illustration, if the primary insurer caps its benefits at $100,000, then the excess insurer would begin providing benefits for all damages of $100,000.01 and above. If in the situation just posited the insured faces potential liability of $125,000 and settles with the primary insurer for $75,000, it is unfair to require the excess insurer to provide $50,000 of benefits since it only agreed to cover damages above $100,000; the primary insurer's benefit from settlement must not be charged to the excess insurer. In such a situation the excess insurer would be liable for only $25,000. See, e.g., Allstate, 509 F. Supp. at 46-48.

Moving to the fact situation in this case, the critical difference between this case and the scenario in the preceding paragraph is that due to the nature of the Lexington policy, no defined maximum benefit for any one claimant exists. Five million dollars is available for all claimants; if any combination of claimants receives the $5 million before any other claimant can file a

---

[10]This is most clear in the case of a true excess policy, as the excess insurer determines the premiums and benefits with express knowledge of the primary insurance policy. It is still true for coincidental excess policies since the premiums and benefits of such policies are discounted due to their other insurance clauses, though the premiums are not discounted as greatly as in a true excess policy due to the less determinate point at which the coincidental excess insurer must provide benefits. See Bosco, 571 N.W.2d at 517-19 (discussing relation of lower premiums to lesser risk in excess insurance).

claim on the policy, the latter filing claimant receives nothing. Thus, when an excess insurer contracts to provide coverage to any one and only one of the entities subject to the Lexington policy without providing coverage for all of them together, it has no rational basis of assuming that its coverage will begin at any value greater than $0.01.[11] Thus, the impact of settlement with the primary insurer in this situation is not the same as settlement in the scenario where the primary insurer and the excess insurer cover only one insured; the "available" limit of insurance is instead a moving target. Plaintiffs certainly cannot recover the entire amount needed for the DPS settlement from Defendant as that would create a windfall, but the "other insurance" clause of the Travelers policy is not a basis for denying any coverage to Plaintiffs.

3. <u>Defendant's Maximum Exposure is $1 million</u>

I find that $1 million is the maximum coverage available. The Travelers policy contains the following clause:

> One or more CLAIMS arising from the same act, error, or omission or a series of related acts, errors or omissions shall be considered a single CLAIM. All CLAIMS under this provision deemed as a single CLAIM shall be considered as made during the POLICY PERIOD in which the earliest of such CLAIMS was first made. The inclusion of more than one of YOU covered under this policy shall not increase either the applicable limit of insurance or YOUR deductible.

(Def't Mot. for Summ. J. Ex. G § III.B.) "Claim" is defined in the policy as a:

> Demand for money or services, naming YOU and alleging a negligent act, negligent error or omission negligently committed in performance of YOUR PROFESSIONAL SERVICES on behalf of the NAMED INSURED for others by YOU or any entity, including joint ventures, for whom YOU are legally liable.

(Def't Mot. for Summ. J. Ex. G at 2.) It is undisputed that this policy provides a maximum

---

[11]If the excess insurance policy was issued for the same class of insureds as the primary policy a different result would occur. It is important to note that the combination of the policies in this particular order is what yields this result.

benefit of $1 million coverage per claim and $2 million total. (Def't Mot. for Summ. J. Ex. G at 1.) The issue is whether this clause applies to limit the coverage to $1 million. Defendant argues it does because Plaintiffs' claims are a series of related claims. (Def't Mot. for Summ. J. 13-20.) Plaintiffs argue this clause is ambiguous and should be interpreted against Defendant who is its author or, in the alternative, that these claims are not related. (Pls. Mot. for Summ. J. 15-20.)

Addressing Plaintiffs' first argument, I find that this clause is unambiguous. Contractual language is ambiguous under Michigan law when the words "may reasonably be understood in different ways." Raska v. Farm Bureau Mut. Ins. Co. of Mich., 314 N.W.2d 440, 441 (Mich. 1982). Each party has cited a multitude of cases regarding the ambiguity or lack thereof of the word "related." See, e.g., Gregory v. Home Ins. Co., 876 F.2d 602, 605-06 (7th Cir. 1989) (defining related as "cover[ing] a very broad range of connections, both causal and logical"); but see St. Paul Fire & Marine Ins. Co. v. Chong, 787 F. Supp. 183, 187-88 (D. Kan. 1992) (finding "series of related wrongful acts" to be ambiguous) aff'd 979 F.2d 858 (10th Cir. 1992). Plaintiffs argue that the various definitions given by courts around the country for "related" proves that the term may reasonably be understood in different ways. (Pls. Mot. for Summ. J. 19.) Defendant responds that this term has a common meaning which is unambiguous, and that meaning should be given to the term. (Def't Resp. Br. 17-18.) Defendant is correct. Although the term "related" is very broad in its scope, it has a clear definition in the language generally, as well as in the insurance industry in particular. See Sigma Financial Corp. v. American Int'l Specialty Lines Ins. Co., 200 F. Supp.2d 697, 706 (E.D. Mich. 2001) (Borman, J.) (stating "the term related may ... be commonly understood" while "interrelated" is not); 2 Allan D. Windt,

Insurance Claims & Disputes § 11:22D p. 123 (4th ed. 2007) ("'Related' is a common word used in liability insurance policies [and] should be held to mean 'in connection with, associated with.'"). Because related has a commonly understood meaning, the clause is unambiguous.

I find this clause applies because the claims against Plaintiffs "aris[e] out of a series of related acts, errors, or omissions," and therefore Plaintiffs are entitled to no more than $1 million of coverage. The claims against Plaintiffs are the two counts for damages filed against it in the DPS litigation:[12] (1) breach of contract and (2) professional malpractice.[13] (Def't Mot. for Summ. J. Ex. F.) It is clear that these claims arise from the negligent design of each of the schools. Plaintiffs argue these negligent acts are not related for two alternative reasons: first that the structural steel flaws are unrelated to the mechanical design drawing flaws, and second that the flaws in the Taft school are unrelated to the flaws in the Schulze school. (Pls. Resp. Br. 15.) These arguments are both incorrect. The acts from which the claims arise are failures to properly perform the duties required of Plaintiffs in their agreement with DPS. The negligent failures to properly design the schools, regardless of whether the errors were regarding different systems designed by different engineers or whether similar errors were made in two different school buildings that resulted in different quantities of damage for each building, are a series of

---

[12] The reason these have to be the claims is clear from the definition of "claim" in the policy: a claim is a demand for money. (Def't Mot. for Summ. J. Ex. G at 2.) Thus, no complaints from DPS regarding Plaintiffs' work constituted claims under the Travelers policy until a demand for money was made, and no demand for money arose until the DPS litigation was filed. Thus, the claims have to be the demands for money seen in the Complaint filed in the DPS litigation, and are equivalent to the two counts named therein.

[13] As Defendant correctly notes, the third count of the DPS litigation that sought declaratory relief is not a claim pursuant to the Travelers policy because there is no demand for money or services. (Def't Mot. for Summ. J. 14.)

related acts within the meaning of the Travelers policy. The fact that DPS contracted with Plaintiffs to design these schools in a practically identical fashion only highlights this fact. (See Def't Mot. for Summ. J. Ex. E.) Therefore, Defendant's maximum exposure on these claims is $1 million.

## IV. CONCLUSION

For the aforementioned reasons, I hereby GRANT IN PART and DENY IN PART Plaintiffs' motion and GRANT IN PART and DENY IN PART Defendant's motion, finding Defendant has a maximum exposure of $1 million to Plaintiffs for the DPS litigation.

**IT IS SO ORDERED.**

Date:   July 31, 2007             s/John Feikens
                                  United States District Judge

> Proof of Service
>
> I hereby certify that the foregoing order was served on the attorneys/parties of record on July 31, 2007, by U.S. first class mail or electronic means.
>
>                    s/Carol Cohron
>                    Case Manager